Hotel & Motel Trades Council. Good morning. Thank you, Judge Dacobs. Ken and Shanmugam of Williams & Connolly for the appellant, Chelsea Grand. May it please the Court. Arbitral awards are subject to deferential review, but this is the rare case in which such an award cannot stand. The arbitrator in this case, purporting to construe an agreement between the union and a third party, bound Chelsea Grand to the substantive terms of a fourth party's collective bargaining agreement. And so your argument is that this demonstrated a manifest disregard for the law, is that right? And that the arbitrator exceeded his powers. So Judge Eaton is— So they're really—are they different somehow or another? I think that they are different standards. They've been recognized as different both outside and in the labor context. And the manifest disregard for the law, does that—I take it that the way that after Hall manifest disregard for the law in this circuit, as well can be found in the leading case of Dozier versus Seaport Group, is that our court has held that manifest disregard for the law is a judicial gloss to the things that are actually provided for in the statute. In the Federal Arbitration Act, that's correct. But there's no dispute in this case that that is the applicable standard with regard to what I'll term our procedural challenge. So as you're aware, we have both the procedural challenge, that what the arbitrator did here was effectively to reinstate and modify, to some extent, the 2008 award which the union had abandoned, which the union made no effort to enforce. So it seems to me that this gloss actually highlights just how difficult, how steep the Can you explain to me what your CPLR argument is? Judge Eaton, it's a very straightforward argument. It is that under the CPLR, which is incorporated in the industry-wide agreement, there is a one-year time period for the enforcement of an arbitral award. And — Judicial enforcement. That is correct. But the effect of failing to enforce the award is that it cannot be reinstated or modified subsequently. And that is the import of the Board of Managers of Diplomat Condominium case and the PROTOCOM case, which we cite. Well, what it means is if you don't move in the first year, you can't get a court to bring court powers to enforce it, but you certainly can sue on it as a contract, right, can't you? Until the limitations period for that expires. But the — Okay, so now let me ask you that question. Did you raise a contractual statute of limitations issue in the later arbitration as to the 2008 award? No, only because this was not an effort to bring a breach of contract claim. In the subsequent proceeding — Well, it sought enforcement of rights that the arbitrator previously articulated under the 2008 agreement. Whether he had the authority to do so or not is another matter. Absolutely correct, Judge Wesley. But our argument was a subtly different argument, which is that you simply can't go back and reinstate a preexisting arbitral award. And that was precisely what the union was seeking to do here. But Article 75 also gave you a remedy to vacate the award. That is correct. Why didn't you do that? Well, we did not file an independent motion to vacate, just as the union did not file a motion to confirm. You had an award that was forcing an agreement on you. I would note, parenthetically, Judge Wesley, that we did raise that issue in the context of the ongoing proceedings on the 2007 award. In fact, it turns out that there was actually an effort made in those proceedings to amend the petition to vacate, to bring in the 2008 award, which the union opposed. We made quite clear, as we've believed all along, that that award was substantively improper under the very familiar H.K. Porter principle, that it is just impermissible to impose substantive terms. Well, I've got questions for the union on that. But I just have a hard time — this becomes such a tangled ball of yarn. You've got the earlier decision in which you're litigating whether you're responsible for what independence has tied you to, and Crotty ultimately decides that after a considerable wait. Then it comes up here, and we affirm Judge Crotty's determination of the earlier arbitral award, and we're quite clear in what we say.  It's a union representation drive in the aspect of that you're bound by disclosing your employees and check-off and all that other stuff. Yeah, and I do want — and I hope the Court will give me a little bit of time to get to the substantive argument, but let me address your question. Well, that's up to the Senate chair, but right now I'm interested in a few things, and whether that allows you to get your substantive argument is another question. Well, let me address your question. So let me finish. I'm here first — well, please finish first. So then you get the 2008 award, which says you're going to pay these things until you agree to a collective bargaining agreement, right? Correct. And you don't move to vacate that right away. So let me attempt to untangle — I understand finding fault for them not confirming it, but it's a two-sided coin. You've got a remedy, too, that you never, ever use. I'm happy to acknowledge that the better course would have been to file an independent motion to vacate. But let me try to untangle the ball of yarn and address what I think is your underlying concern here. So it is certainly true that in the 2007 proceedings, which took several years to complete, the question was whether we were bound at all to any terms, and in particular the card check neutrality terms that would govern the recognition of the union. Critically, in the course of those proceedings, the union at every turn — and we have several citations in the joint appendix that bear this out — said effectively that the only terms that we were bound to were card check and neutrality terms, that we were not bound to substantive terms. In other words, the union had every incentive in those proceedings not to argue that we were subject to substantive obligations, and I think that that explains why the union did not seek to confirm. Now, yeah, sure, we did not file an independent motion to vacate, but the question before this Court, the question that was before the arbitrator is, what is the effect of the failure to confirm when the union comes back many years later and says, we are seeking effectively to enforce that earlier order, the consequence of which is to hold us liable for what now turns out to be $11 million, $11 million in retrospective damages? And of course the union not only made no effort to confirm the award, the union made no effort even at the time to quantify the amount of available damages, and I think that just points up that what the union has done is abandoned the award, and under clear, unambiguous New York law, that is the one thing you cannot do. You cannot seek to come in after the fact and commence a new arbitration proceeding, and the reason why that would be problematic is that it would blow up the one-year limitations period, because all a party would need to do is to commence a new arbitration period — arbitration proceeding outside that time period. JUSTICE SCALIA. Well, let's set all that aside now, and with the Senate chair's indulgence, because this is a gnarly little case, in my view. JUSTICE BREYER. A gnarly big case in my client's view. JUSTICE SCALIA. Well, a gnarly big case in your client's view. JUSTICE BREYER. You may go ahead. JUSTICE SCALIA. $11 million is not — even in Livornia, New York, that's a lot of money. In fact, I don't think most people in Livornia, New York, have any conceptualization of $11 billion, but anyhow, set that to the side. If you're right about that the agreement that was imposed by the 2008 award as being a violation of national labor relations standards or the National Labor Relations Act, then the rest — all of that is — we don't have to trouble ourselves with, do we? JUSTICE BREYER. Well, so that is correct. And I do want to say a word about that, because I think, quite frankly, the straightest course for a reversal in this case is to say that what the arbitrator did here, regardless of the ball of yarn and the procedural complexity, was plainly substantively improper. It was inconsistent with a principle that was articulated by the Supreme Court in which this Court has re-articulated on numerous occasions. And in this Court's own words, it's the proposition that imposing a contract on the parties is, quote, a notion that has always been anathema to the NLRA. And I think with all due respect to the arbitrator, the arbitrator really offered no even arguably plausible way around that principle, nor did Judge Crotty in the decision under review. Judge Crotty simply cited a decision from this Court in the context of successorship, where you have a successor employer who steps into the shoes of a prior employer. And in that context, it has been permitted to impose substantive terms, but only up until the point of impasse, and only based on the fiction that that successor employer is succeeding to the obligations of the preexisting employer. But he had to find an interim remedy someplace. Where would he find it if not in a contract that already existed? As you might imagine, Judge Eaton, this is an issue that has come up numerous times in cases where you have parties that do not reach an agreement, and where there is a claim by the union that the employer has engaged in bad faith. In a footnote in our opening brief, we cite two NLRB memos that set out the Board's position as to the permissible remedies, and as Your Honor will no doubt be aware, there are a number of things that the Board or an arbitrator that has appropriate authority can do, such as setting an expedited schedule for bargaining, requiring a party to pay the costs of bargaining or litigation. But I think it's really a bedrock principle of labor law that what you can't do is impose substantive terms to which a party has not agreed because of the underlying principle of freedom of contract. And I think that the union itself recognizes this in its brief when it says, well, you can attempt to read an impasse qualification into this award. I don't think that that is even plausible. That is obviously not the rationale that the impartial chairperson offered in his ruling on this. But I think it just points up a recognition that imposing substantive terms is simply flatly impermissible as a matter of labor law. And again, regardless of how you construe the manifest disregard standard or in the context of this argument, the standard of an arbitrator dispensing his own brand of industrial justice and exceeding his powers, I think that where you have an arbitrator's action that is inconsistent with flatly governing Supreme Court case law, that satisfies any standard. And again, I think that the arbitrator, the district court, and the union offers no valid response to that. You've reserved rebuttal. Thank you, Judge Jacobs. Thank you. Good morning, Your Honor. Barry Saltzman, PITT at LLP, for the union in this case. The opinion in order of Judge Crotty should be affirmed in all respects. What Chelsea is doing here is to ask this Court to second-guess the arbitrator's interpretation, his application and construction of Addendum 4, which was before him. And under the — and he used the usual tools of arbitral construction and reading, referring to the practice, referring to history, purpose, referring to the terms before him. And what they're asking for you to do is to second-guess that, is to turn this case into Round 2, Round 3, Round 4 of the arbitration. Under the precedent of this Court and the Supreme Court, that is the wrong standard and it should not be accepted. Rather, what Judge Crotty did was view the arbitrator's 2016 award in the proper light dictated by this Court, and find that in each case he was interpreting and applying the contract as he understood it under the usual principles. And yet, this party ends up with a contract imposed upon it that governs all of its relations with the union. No, Your Honor. That is not the case here. They aren't subject to the Wingate — they never signed the Wingate Agreement. As Judge Eaton pointed out, the question was, what do we do now to re-establish good faith collective bargaining? And then the question is, in order to re-establish good faith collective bargaining, does the arbitrator have the power to bind the employer to the contract that somebody else entered into? Not to a contract. The arbitrator has the authority, clearly under Addendum 4, which gives him the authority to impose monetary and punitive damages, which is not board authority. But he has the authority to do that, and that was not a venue that Judge Crowdy went to, but it is argued in our brief. And it is one that the arbitrator followed. So he has that authority completely independent of the board to do that, but he's — clearly he says it over and over again. This is a penalty. This is relief. This is not a contract term because they have the ability to negotiate. I'm sorry. I apologize. Go ahead and finish what you wanted to say. I apologize. No, I think you're going to lead into what I'm going to say. Well, I get excited, you know, and then all of a sudden I start asking, and it makes me rude at times. I'm reminded of that at home. Me too. It's a fault all of us as lawyers share. I don't know if you have children, but all my kids are lawyers. It's terrible. Mine too. So, which leads me to ask — I mean, the problem is that there's no incentive for you to agree to anything because these penalties continue to — or this interpretation of the arrangement — and I think there's some legitimate argument that you're making here about that this is — he's enforcing — he's visiting upon the hotel in Chelsea — it's responsibilities for failing to have negotiated in good faith, okay? That's fair. An arbitrator can do that. But to address Judge Jacob's concern, the arbitrator can't force a contract on people, and the arbitrator's ward says that you're going to pay the Wingate rates until you reach a collective bargaining agreement. It doesn't say or you reach impasse. There's no incentive for the union whatsoever to agree to anything. And the union can, quite frankly, act in bad faith and not even refuse — and can refuse to negotiate. In fact, you didn't negotiate for a long period of time. And your opponent says not only did you not negotiate, you said don't worry about it. Set that aside. And why should we read impasse into an award where the arbitrator was quite — I think the arbitrator had to know exactly what he was doing, and he didn't — he was imposing a penalty on these folks. And isn't the absence of impasse make it violative of National Labor Relations Act? No. Now, Your Honors asked me a number of questions. And I would like to try to address them all. I was trying — listening very hard, so I didn't write them all down. But if I miss any — I'll do even better. I'll tell you if you've missed any. Absolutely. Thank you. First, the union has an incentive, regardless of what anybody else says, in the collective bargaining context. The arbitrator said this is a penalty. It is a penalty. It is a floor that was established under Staten Island Hotel that was necessary because you have to start somewhere. But start to begin collective bargaining. I'm not in favor of that. I agree. But a contract is much more than a penalty in labor. Not only is it bilateral, which is what Judge Crotty noted in his decision, but it is the essence of what the union needs to obtain. It is a recognition that these parties are now joined in a cooperative effort — maybe yin-yang — but it is an effort to create a working environment. And most significantly, it is an acknowledgment that the voice of the workers in that environment, as represented by their chosen bargaining agent, is heard. Chelsea sought to destroy that environment, that collective bargaining, completely, since 2007 on, to this very day. They have held on — in the beginning, they actually did every classic, egregious, unfair labor practice — threats, discharge, establishing unilateral terms, everything that the arbitrator noted in 2008 and 2007 that would be classically designed to destroy the union in the eyes of the workers. And then, they held on to the fruit of that by not complying with the arbitrator's order to set the conditions back for good-faith collective bargaining. And I get that. And I guess the thing that troubles me about that is that you would have had it locked up in a judgment of the court if you had moved to confirm the award. Now you might have gotten it set aside for a period — probably would have gone to Judge I mean, I'll talk about the elephant in the room. You wait a long time to get a decision, both of you did, on the 2007 award, a long period of time. I'm not sure I heard the answer to the question that Judge Wesley posed first, which is, given this penalty, what's the union's incentive to negotiate? After all, if Chelsea Grand offers less than the Wingate contract provides, the union doesn't have to agree because it's going to get the Wingate contract anyway. To obtain — the union's incentive is to obtain a mutual, bilateral, collective bargaining  Until we have that — From this point of view, the work — the point is to get hourly wages, overtime, benefits, and the other advantages of the union. And they've got it. So I keep going back to the question that Judge Wesley posed, I think, ten minutes ago. What is the union's incentive to bargain, and isn't that exactly why H.K. Porter prevents people from imposing, over the rights of contract, a collective bargaining agreement? I tried to address the union's incentive. We do need — I'm sorry, I don't — I'm sure you did. I just didn't get it. Okay. I'd like to loop back to that first, because I want to go into H.K. Porter up there. Because they run in tandem. Is that okay with you? Absolutely. Thank you. Okay. He's the Senate chair. I have no choice in that. Go ahead. Well, the — in Staten Island Hotel, Judge Kearse dealt with a situation very comparable to this one. And she said that you have to have the floor. And when choosing the floor, you — she did impose the wage in hour terms that existed in somebody else's contract. You have to have a floor one way or another. Don't choose the one of the party that has destroyed collective bargaining. Choose the one that is the most legitimate and most comparable, which is what Judge Kearse did in Staten Island. Choose the one — Otherwise — Choose the one — The level to begin the bargaining. Which is indistinguishable from the terms of a contract. Although I suppose — Well, it's — If the penalty and the union fails to negotiate in good faith, the penalty could be withdrawn because Chelsea Grant can go in and say they're not negotiating in good faith. That's certainly true. That would be one of the things Chelsea Grant could do. It's unlikely. And the difference — I don't know why it would be unlikely any more than either alternative. The — Chelsea can go in and say the union is not bargaining in good faith. The union can say the same thing. Chelsea can say we've bargained in good faith. We are at impasse. It's now time to stop the bike. That gets us out of what you would call the contract, right? Because there's a difference now. They have that ability all along. We don't — they don't have that ability if there's a contract. And that's what the union wants, a contract, because you bound by to that contract. Now — There was a point that you made and I missed it. You know, yes, it set a floor. You want to negotiate wages higher than that. You want to negotiate terms, in your view, that were better than that. And I presume that's what your incentive is, that the Wingate agreement establishes the floor under Staten Island and you work from there. You don't go below it. You start there and you go up. I mean, where you start is always a key factor in a negotiation. Absolutely. It's critical. The problem — the thing that still troubles me so much is that if you'd simply gone and confirmed the award, the 2008 award, we wouldn't have this huge problem of the fact that it doesn't say impasse in the award. That would have been — that would have been resolved. But so much time has gone by that now you've got this huge amount of money. You say it's their fault. They didn't comply. They say that the arbitrator was way beyond his authority and they raise issues about why you can't enforce it. But if they're wrong about that, ultimately, one of their arguments is that it's completely unenforceable and violative of the National Labor Relations Act. So therefore, any award that subsequently reaffirms it or enforces it, itself is violative of the National Labor Relations Act, and that's a sensible argument to me. It troubles Judge Jacobs because he keeps asking about the contract. I mean, we're now here and there's an award that doesn't say impasse in it, and it's now resulted in exposure of $11 million. Now, it may be — they may deserve it or they may not deserve it, but if it's violative of the National Labor Relations Act, we probably are not going to give effect to it. That's it. Can I ask a question? By all means. All of the terms of the Wingate Hotel contract were not imposed on Chelsea? Under Judge Crotty's 2016 award, it's only the monetary terms. It's only the money. So are there other important terms in one of these contracts? There are, of course. Give me an example of one. Other terms would be work hours, recall, seniority rights. These are critical in any collective bargaining relationship, and those would be negotiated — And benefits, though, are — Benefit contributions — — are from the Wingate. The benefit contributions were, yes. Yes. What about grievances? Are grievances taken care of in — Grievances were not — well, they were already bound to arbitrate under Addendum 4 in Article 26, because both were incorporated into this Court's decision in 2004. But those Wingate terms with respect to grievances weren't imposed? No. All that was going on here was we were finding the amount of money to impose as the penalty. That's what we contend. And the fact that the arbitrator didn't specifically say the word impasse in the context in which he ruled, that is implied. Now we cited in our brief a number of decisions of this circuit which say that if you've got alternative ways to read the arbitrator's decision, you're going to try to use the one that is legitimate, and in this case, I would say all the more so not to punish the innocent party but to hold the wrongdoer to the fruits of its wrongdoing. Here the arbitrator over and over and over again said, I am trying to reestablish good-faith collective bargaining. That means bargaining to impasse in any labor arbitrator. That's how the union understood it. That's how they understand it, because we're still bargaining. Everybody understands that if they go — if they bargain in good faith, then they can go to the arbitrator, they can go wherever they want to go and say, we've got an impasse, we're out of it. But they have never bargained in good faith because they are holding fast to the fruit of that poison tree. Thank you, Your Honor. Thank you. Thank you, Your Honors. Mr. Saltzman and I agree on one thing, which is that the starting point here is the contract. It's the language in Addendum 4 which governs the arbitrator's powers here. It can be found at page 127 of the Joint Appendix. And the principal basis for the arbitrator's award, we had thought, was the language that empowers the arbitrator to issue such remedial orders as are consistent with NLRB standards. And I think Mr. Saltzman really offers very little by way of a defense of how this is consistent with NLRB standards. Again, the HK Porter case is directly on point. If anything, this is a worse case than HK Porter which involved but one contractual provision because if you take a look at page 28 of the Joint Appendix and you look at the arbitrator's award, the arbitrator was binding us to, quote, the current wages, benefits, and working conditions contained in the current Wingate collective bargaining agreement. That is all of the terms of the 2012 industry-wide agreement. The HK — Do I disagree with his answer to Judge Eaton's question? Yes, relying on Judge Crotty's opinion, which I don't think can be governing here. In other words, the question is what did the arbitrator award? And I think that the language on page 28 of the Joint Appendix is unambiguous. And quite frankly, if you take a look at the 2012 industry-wide agreement, it imposes a litany of conditions. As you might expect, a 35-hour work week for non-tipped employees, restrictions on discipline, a requirement that cooks have to be supplied with a uniform consisting of a jacket, cap, apron, kerchief, and pants. I mean, the list goes on and on. We are subject to all of those obligations under the arbitrator's award. And I think regardless of the extent of those obligations, this is precisely what HK Porter does not permit, even if it were just wages and benefits. That is substantively improper. And I think in an effort to get around that, Mr. Saltzman now relies primarily on the subsequent language in Addendum 4 that permits the award of monetary or punitive damages to either party. That argument was made at most obliquely in his brief, but I'm happy to address it because precisely because of the language that I've just read, this cannot be characterized as a mere award of damages to either party. This operates prospectively. It governs the employment of future employees as well as the employees who have been employed in the past. There are a whole host of non-monetary obligations. And critically, to the extent that there is monetary relief here, those benefits run to the employees. They do not run to a party, the union. And so I really don't think . . . If you were to win, if you were to win, where is the situation left that workers have selected a union, negotiations are going on or not going on for a decade, there's not going to be any floor. There's not going to be any premise for negotiations. I don't know where . . . I mean, I can't imagine where we would be if your arguments, articulate as they are, would have prevailed. Jacobs, let me tell you exactly what we are asking for. We are asking for a reset. And we're asking you to put us in the position that any employer is in ab initio when a union is recognized. As your Honor will be well aware, because I know you've seen quite a few of these cases over the years, what happens in that circumstance is the employees are, of course, subject to the existing pre-union terms and conditions during the period of good-faith bargaining. And what they are not is subject to the terms of another hotel's collective bargaining agreement, which as Judge Wesley has pointed out and which you have also pointed out, obviously imposes a much higher floor and therefore provides a much lower incentive for the union to bargain in good faith. And so all we're asking for is a reset to that ordinary pre-union level of terms and conditions. We bargain in good faith. If we reach an impasse, an impasse is then declared. Of course, the employees retain the ability to strike. All of the things that typically happen at the outset. But what we are . . . Back to where you were in 2004. That is correct. And we are free of this . . . That's a long journey. Well, but we are free of this retrospective award of really crushing liability. And I don't want to lose sight of the fact . . . Are we rewarding your intransigence? I don't think so. And I think that that's in part because what you're really doing is giving a fact to . . . I'm not making value judgments, Mr. Shumlin, but it's troubling. This is a case of long duration and maybe . . . I'm troubled by how long it took you to get an answer to the original decision, but I'm also deeply troubled by the failure of both sides to seek a clarification of the 2008 award and its legitimacy. We wouldn't have half the trouble in this case right now if we knew that the 2008 award was legitimate. If it was legitimate, you would have no argument, other than on the punitive. And Judge Wesley, I recognize the temptation to say a pox on both of our houses, but I think . . . No, no. That's an appellate judge's dilemma. We're stuck with the cases it's made, so we're going to . . . The legal question . . . . . . whether we like it or not. Judge Wesley, the legal question before this Court is what effect does the unconfirmed award have? And as I say, the reason to penalize, and you're not really penalizing the union for that, is because they had good tactical reasons not to seek confirmation. No, I wouldn't . . . I don't want either one of you to . . . But . . . From my perspective, that that's my dilemma. It's just, it's the fact that how it presents itself makes the issue harder, in some ways, to resolve. I totally get that, and just to finish my answer to Judge Jacobs' question, I think what we're asking for here is twofold, to be free of the inequity of this massive retrospective monetary award, and again, to be put in the position that a party is ordinarily in when a union has been recognized. We have a good-faith bargaining obligation. If we don't adhere to that good-faith bargaining obligation going forward, the union is allowed to seek the remedies that are prescribed under labor law, but all that we are asking is to be able to negotiate from an appropriate baseline, and not to be held to ransom by being subject to the terms of another hotel's collective bargaining agreement, a practice by the arbitrator that I think the union effectively recognizes today is really without precedent. Thank you. Thank you both. Thank you both. We will reserve a decision. In the case of United States v. Jenkins, we'll take that on submission, and in the case of Johnson v. Turnbill, we'll take it on submission. That's the last case on calendar. Please adjourn court.